All right. Go right ahead. Thank you, and good morning. May it please the Court. My name is Nicholas Emanuel, representing the appellant, Charles Clagett. What's notable about this case is that on these facts, summary judgment would have been inappropriate under any circumstances, but it was certainly inappropriate here where the plaintiff was operating under the twin infirmities of being both incarcerated and unrepresented, beginning with the First Amendment retaliation claim. Could you forgive me for interrupting, but there were a lot of claims earlier, and I just want to be clear that we're narrowed down to there's a First Amendment claim left against the wardens, plural, both wardens, right, arising out of the transfer, but not the bedding. Correct. Okay, and then an Eighth Amendment claim against Castro. Correct. Again, arising out of the transfer. And not the bedding. Okay, and is that the waterfront, or are there any other? That's the sum total of what we'll call the remaining claims, yes. Thank you. Thank you, Your Honor. And beginning with that First Amendment retaliation claim, retaliation in response to grievances and, indeed, the filing of the instant lawsuit, I think it's important to point out, with respect to the retaliation claim, that in a retaliation claim such as this, it would be the rare case, indeed, that any of the defendants admit retaliatory motive and said, well, the motivation for this transfer was because we wanted to retaliate. What's the circumstantial evidence of the improper motive? Precisely. So these cases are often proven by circumstantial evidence, which we have here. We have conflicting accounts, conflicting reasons for the transfer. What's interesting about that, because that's the type of circumstantial evidence that can often be used, even as sufficient evidence to support a verdict in favor of the plaintiff at trial, but here those conflicting accounts actually came up during the course of the litigation itself. Okay. So you're down to eight minutes. There's proximity in time. Okay. What other kind of circumstantial evidence, please? Proximity in time, conflicting accounts for the reason for the transfer. So you're referring to the comment about you'll see or wait and see that comment? No, Your Honor. The conflicting accounts arose in the course of the litigation in response to the success of summary judgment. Oh, attributing it to the conduct in the law library versus, right? Exactly, and I think that's the most significant. Okay. And is there anything else by way of circumstantial evidence from which we should think there's a question of fact regarding motive? Not other than what we've listed, Your Honor. Well, in terms of the two defendants we're talking about now are Woodring and Young. Are those the two people? That's correct, Your Honor. And did Woodring shift gears, or he just said in general, I don't know? He universally disclaims knowledge of the reason for anything, which I would point out is not helpful for a moving party on summary judgment. Well, that's true, but he's also the warden, and the fact that he might not remember this is not so peculiar. Sure, and an appellant's not suggesting that that could certainly be the case, and an appellant's not suggesting that someone should somehow be penalized for not remembering, but it just might be the case that they're not entitled to summary judgment. But because this is a First Amendment issue, we're looking for the motivation of the particular people that we're talking about, right? Yes. So what about Young? Did he himself personally switch gears? Yes. In the subsequent declaration, Assistant Warden Young, which is 155 to 156 in the record, and he is the only one who takes the unequivocal position the second time around that the reason for the transfer was because of specific misconduct committed at the library job. Associate Warden Young is the only one who takes that unequivocal position, and that differs from his first declaration, which is found just later in the record at the pertinent pages, or 164 to 165. But it's a little confusing, right? Because in the second declaration, Wood takes that position, but he actually attributes it to Woodring, right? Correct, and Woodring says, well, you know, I don't remember any of that. Right, but Young says this notion first came to him from Woodring. Woodring had mentioned concern about staying too long in the library. Correct, Your Honor, and it's interesting because if you go through the declarations and there are a number of others submitted the second time around, it's sort of difficult to track it all the way down. It's almost a game of telephone as to finding who is the actor, who is the decision maker that made this decision. It's very difficult to pin down, if not impossible. Does anybody ever take responsibility for it if we drill down? Because I looked. My answer is no, Your Honor. I mean, that was not apparent to me, and that's certainly something I was looking for in this record, saying, okay, who's the decision maker, and then what evidence do we have to rebut that notion or whatever. But we don't see that here, and that's problem number one with moving to summary judgment is no one stepping up and simply saying unequivocally, here's the reason, here's the non-retaliatory reason, the legitimate penological interest in the language we're using here for the transfer. Nobody really does that, so that's problem number one. But maybe that's just what Judge Berzon said, which is that they just don't remember necessarily. And that's fine, Your Honor, but they may not be entitled to summary judgment then. Well, not remembering is different than summary judgment, genuine issue, fact about improper motive, right? Sure, sure. But as we went through several moments ago, appellant has produced evidence from which if we're drawing all inferences favorable to the plaintiff, which we must in this posture, certainly a retaliatory motive can be drawn. The district court in this case simply looked at those generalized statements that the transfer was because of misconduct and said, well, plaintiff hasn't submitted anything to rebut that, and so therefore summary judgment is appropriate. I'm wondering, the second declaration of Young is the 227-2013 one, that's the second one? I believe so, yes, Your Honor. All right, and so the first one does mention this. The first one says, I do recall one time in 2008 when plaintiff worked in the education department, the warden mentioned to me that the education staff expressed some concerns about plaintiff being suspected of working on specific legal matters. So he did say that both times. He did say that both times. He did mention it the first time. But if one reads all of the declarations, or in the case of the first time around, it's both declarations, his and Woodring's, it's clear the gist, the reason for the transfer they're saying is this one-year policy. An inmate should not be allowed to work at a position for more than a year, and that's sort of a generalized policy. Well, he actually said it shouldn't be a job for too long, and he'd been working there for about a year, actually 11 months, so it doesn't seem so far off. It's not far off. I think it's clarified in other parts of the declaration that it's this about-a-year policy. It was only 11 months. But the key point, Your Honor, is that just a fair reading of the declarations, and indeed here plaintiff's entitled to every inference in his favor, but even just a fair reading of the two sets of declarations the first time around, the gist is the reason for the transfer was it's been almost a year. That's why I was trying to ask you what the specific people said, because if you look, the second set of declarations certainly did try to make the misconduct the issue or the supposed misconduct, and it was very vague, and some people said, you know, some people do this and so on. But in this instance, we're talking about the motives of specific people, right, not just generally. Yes, I think we have to, Your Honor, and plaintiff attributes specific retaliatory motives, and the response to that, if you will, from the individual defendants, is essentially a universal disclaimer of any specific knowledge. It does get specific. Well, no. I'm sorry. Woodring disclaims knowledge, and Young seems to say pretty consistent things. Well, I don't think it's entirely consistent, Your Honor, because if one reads the first Young declaration, it certainly appears, again, on a fair reading, that the reason he's giving, you know, that's the point we're after is what's the reason for the transfer, and he's stating the reason is because the warden has a policy not to have an inmate working at a job for much longer. And to the extent that it could be construed that he's saying the first time around it was because of misconduct, you know, we have to ask ourselves, why are we straining to construe these declarations in favor of the defendants when, in fact, we should be doing the opposite in this posture? I'd like to address the Eighth Amendment claim briefly. You're going to have to really quickly. If there are any questions, I'd just point to the evidence in the record of the severe back injuries of the plaintiff and the fact that the medical evidence from the defendants was from Defendant Castro herself. So essentially she's just vouching for her own opinion. But she didn't. We'll give you a couple more minutes when you come up. But Castro didn't assign the jobs he was going to do, right? Well, except for Castro was required to clear. No, I mean within the food service. She didn't indicate what he was going to do in the food service. And I don't see anything in the record. Maybe you can address this when you come back. Anything in the record that would have made it inevitable that by transferring him to food service, he was going to be in a position that exacerbated his back condition? Well, I think the answer to that is that at the same time the clearance for food service was given, there was a sedentary only work restriction, I think. Right. So ultimately at the other prison he wound up folding napkins in the food service. And I don't think that's relevant because there's no evidence in the record of what his physical condition is at the time that happened or what the duties there were either. On the other hand, folding napkins sounds fairly sedentary. But there is evidence in the record that he was required to bend and stoop. Well, there's evidence in the record, again, when you come back, there's evidence in the record that he asserts that he did that, that wiping tables required him to bend and stoop. That's different than attributing to Castro knowledge that he was going to have to bend and stoop if he got assigned to food service. I understand, Your Honor. I'd appreciate a couple of minutes on that. Sure. Counsel. Why isn't there a question of fact regarding improper motive? Good morning, by the way. Good morning, Your Honor. A careful reading of the Young declarations will explain why with respect to the ---- Do I have to look at the first one first or the second one? Yes. And I'll reread and I'll re-reference to the Court on S.E.R. 164, paragraph 4 of the Young declaration, because it is the crucial language there that Mr. Claggett is not referencing in his argument. Okay. I do recall one time in 2008 when plaintiff worked in the education department in the law library, the warden mentioned to me that education staff expressed some concerns about plaintiff being suspected of working on specific legal matters when he was supposed to be working as an inmate law library clerk who helps all inmates with the retrieval of law materials. As I was familiar with the warden's general philosophy that an inmate should not be at any one job too long, and as it was determined that plaintiff had been at his current job for about a year, I passed on these concerns to plaintiff's unit team. So in the course of the litigation, I handled it below, the magistrate judge in her report and recommendation found crucially that in her report and recommendation that the evidence was, quote, too vague, conclusory, and meager. So given the opportunity to file further evidence, which is permitted with respect to reports and recommendations, as the Court knows, under 28 U.S.C. Section 636, additional declarations were produced. And the key language from them, and I'll just reference them so the Court can look back at them, are from the declarations of Austin at S.E.R. 105 to 106, paragraphs 8 to 9. Kirk at S.E.R. 132 at paragraph 3. Young at S.E.R. 155 at paragraph 6, his second declaration. But significantly, Claggett himself at S.E.R. 311 at paragraphs 2 and 6, because he stated in a declaration, I inquired as to the reason for my removal from education from Mr. Calderon, who was his unit manager, and, quote, he said that it was ordered of him as a security concern. Well, what's that? What's a security concern? That sounds like a completely different thing. The security concern was all that Mr. Calderon had said to Mr. Claggett at the time. So we got the ---- But that sounds like a ---- I'm looking at that, and that's one of the questions I had, Counsel. That sounds like a completely different explanation to me. No, the ---- I'm sorry. Let me clarify, Your Honor. One of the reasons that there was a policy against someone like Mr. Claggett doing legal work for someone else is that there's a risk of a serious dispute arising if an inmate provides bad legal advice to another inmate ---- Right. That's in your briefing, and we understand. It's just that it's not here. I mean, that's sort of the texture that you filled in with your briefing. But in terms of what we have here, it requires a lot of spackle. Well, the ---- Mr. Calderon is under no obligation to fully explain to Mr. Claggett why they are transferring him. But what I'm representing to the Court is that there is evidence in the record contemporaneous with the transfer that indicates that it's not based solely on a desire to shuffle people around to different positions. But ---- Are you suggesting that the security concern that's referenced by Calderon has to do with the misconduct that he allegedly engaged in when he was assigned to the law library? Is that the connection that you're drawing? Yes, Your Honor. Does anybody in the record have an explanation as to why, after a few months in food service, he was then transferred back to education again? Because if the reason is misconduct there, I find it curious that he be transferred right back there without a declarant explaining that. And if that's the record, then those are the inferences that need to be drawn in his favor. So can you address that gap in the evidence? Your Honor, I can't address the gap, but, Your Honor, I think you're drawing too close a timeline. He was in food service from September 5, 2008, and this is at SER 146, to March 12, 2009. So that's six months. We don't have any evidence as to why he went back, whether he promised he wouldn't do that again, whether they ever raised the issue with him specifically. We don't know. Counsel, here's the problem I have. There's a lot of bits and pieces of evidence here, and I think you're right. There's certainly evidence in the record that comports with your client's view of the case, but, of course, all the facts have to be construed in the light most favorable to the opposing party. So can you just kind of cut to the chase and the nub? Why hasn't he raised an issue of facts since we are obliged to construe it the other way around? But, Your Honor, the Court must analyze the Rhodes factors, and the fifth Rhodes factor that the magistrate judge focused on is the significant one here. The action did not reasonably advance the legitimate correctional goal, as Mr. Wait a minute. That's a particular, that's kind of, you only get there if you first have sufficient, if you have, if the plaintiff, you now seem to be saying that the plaintiff did have enough evidence of an impermissible or a First Amendment related motive, but they nonetheless had a legitimate penological reason for doing the transfer. That's changing gears entirely, isn't it? Well, Your Honor, we never conceded that point below, but the magistrate judge on the first point... Well, you are now. I understand that, but that was a strange place to be focusing because if the question is the legitimate penological goals, I mean, then you have to make an actual finding that he had done these things in, or that they really thought he had done these things in the education department, and that's awfully fuzzy here, isn't it? Well, no, Your Honor, because the record is clear that the testimony from the witnesses — I'm sorry, the declarants — was that even if an inmate law clerk was suspected of taking these actions, he would be reassigned to another department. So there was no standard... I understand, but now, but you're now asking us to make a judgment that that would be a legitimate penological goal, i.e., transferring somebody who was suspected without — but even if there wasn't any basis for it — out of the education department. Well, Your Honor, there is evidence in the record that his supervisor, someone who worked in the staff in the library, witnessed him doing these actions, and that it was reported to the supervisors, and it was reported up the chain to the warden. Is there any indication that this... I thought all that they knew was that a lot of people came to him to try. Your Honor, from Mr. Austin, and I'll read from the SCR, during the time — this is at SCR 105 — during the time that I supervised Mr. Claggett, I had suspicions that he was improperly assisting other inmates with their legal cases while he was working as an inmate clerk. These suspicions were based on my observation of an unusually large number of inmates who had come to the law library. So this is direct... So the legitimate penological goal piece is presumably essentially an affirmative defense, and you'd have to make — somebody having suspicions from the fact that something else that he was typing a lot, you'd have to be able to substantiate on the current record that that's enough. And I don't know if you want to undertake that, Bern. I thought you were focusing on the motive question. If you get to legitimate penological goals, even if they had the motive, it seems to me you have a much harder burden to bear. Well, Your Honor, we have not conceded on the issue of the motive. We have briefed that below. The reason I focused on the legitimate penological goal is that that was the finding of the district court. The district court did not find... You don't make findings on summary judgment. That's the problem. I'm sorry? What? Judges don't make findings on summary judgment. That was the ruling. That was the ruling. Can I have you clarify something that you said? You indicated that it was reported up the chain because — because I agree with you that if there were suspicions and the record, it's uncontroverted that he was in violation of the rules and that's why they moved him. That would make it a different case. But I couldn't trace the reporting up the chain and who learned what from whom, and it's all very, very muddled. So Austin reported it to his supervisor. Is there a declaration from the supervisor saying that he had shared it with the warden? The problem with this is that not everybody could recall exactly what had happened here. And there was no formal write-up. There was no investigation. So Calderon, who is the unit manager, did not specifically recall this, but he referenced in his declaration the timeline and the entries that were made into the system. So we have contemporaneous computer entries that were made, and we know that the person who likely would have made them, he just said, I don't remember doing this. But we have the declarations of Austin and Kirk who were there who recalled that this was the situation. And certainly we don't believe that the record establishes a genuine issue of fact with respect to the motive. However, since the magistrate judge in her report and recommendation and the district judge in approving it found that there was a genuine issue of fact, we are focusing on the legitimate penological goal here. We certainly believe that there is not enough evidence in the record to tie that, presumably, particularly because the timing of the transfer is only based on a connection to a stray comment, you'll see, which has no other basis for an explanation. You'll see we're going to get you for doing this. There's nothing further there. So the entirety of the claim is based on that. I only have 30 seconds. If the Court has questions about the Eighth Amendment claim, I would be happy to address them. Otherwise, if there are further ones about the First Amendment claim. Kagan. But the timing, it was done the same day as the you'll see comment? It was done, but there's no connection in the record from Woodring or Young having instructed Calderon or ordered him to do that. That's where the evidence is lacking. Well, wait a minute. Wait a minute. Can you just, because that is the nub of the case as far as I'm concerned. Can you back up and tell me why isn't that significant? I understand it's contested. Significant circumstantial evidence, because I tend to read the declarations the way you read them, counsel. But when I put it all together, particularly the temporal connection in this comment, you'll see, that's the alleged comment, why isn't that enough? Well, Woodring is the one who's alleged to have said you'll see.  Then we have a declaration from Young saying at some point he referenced to Calderon that there was this issue going on. So where's the connection between the you'll see and Calderon or you'll see and Young? There is none. There is no evidence. So it's all speculation that this stray comment by Woodring and this transfer occurred necessarily suggests retaliatory motive. The entirety of the case is based on this. But the comment, right, the question was are you satisfied with the result of your grievance? That was the betting issue, right? Right. And then Mr. Claggett responded apparently affirmatively, and then the response is you'll see. So opposing counsel's argument is that that's viewed in the light most favorable to his client, that that's sort of sinister. What's your best response? I think our best response is that the looking at this and trying to determine whether a rational fact finder would find this, would find in favor of the plaintiff. The warden is responsible for signing off on every single claim that is made by an inmate. So to suggest that the warden is going to be, in a situation where it's been resolved, is going to now retaliate for someone filing a claim strains credulity. Well, it wasn't resolved. In fact, it was resolved adversely to Claggett, right? Right. So the question then is why is the warden then retaliating when it's been resolved in the favor? To the extent that we're trying to look at this and determine on the record as a whole whether this one stray comment is sufficient to send this to a jury, there doesn't seem to be. You think it's not enough? It's not enough. Okay. Thank you. Thank you, Your Honor. Counsel? Feel free to move that microphone if you're a lot taller than that microphone, if that's better. Okay, go ahead. Thank you, Your Honors, and I'll just make three points on rebuttal. First, with respect to the you'll see comment, the temporal proximity, it was the same day, indeed just hours before the transfer, so the temporal proximity there of something that could be construed as a somewhat threatening comment, the temporal proximity could scarcely be more compelling there. Am I right about how your client responded? The gist of it is the warden asked whether he was satisfied, and he said something in the affirmative? He did. He said, yes, which I take to mean what can I do? That was the process, and my grievance was heard, and it didn't go my way, but I suppose he's satisfied with the process. The second point I'd make is coming back to Your Honor's question initially about what evidence there is that Dr. Castro knew that the dining service duties would be essentially non-sedentary, would involve bending. But I think the question at this point that we need to ask is whether it's a dining hall position would involve non-sedentary duties and would involve bending. And I think it is a fair inference on all the facts that Dr. Castro knew. What about the legitimate penological purpose? Yes, Your Honor. Which the magistrate judge relied upon. Yes, Your Honor. And I think that is, again, by definition there's a question of fact there because there is at least construing the declarations in the light most favorable to plaintiff. There is inconsistencies there, and in order we've got to start weighing credibility in order to make a determination. Well, what if they're all legitimate penological interests? What if the declarations indicate, and this is sort of how I read them, that they're inconsistent only in the sense that they attribute different reasons, but what if each of the reasons is a reason that could have a legitimate penological interest? The reasons they're proffering all could, but the question is the veracity, essentially, whether that was the true purpose or whether it was, as plaintiff alleges, retaliatory. But I gather that for this purpose, the question of whether he actually did any of the things he wasn't supposed to do in the education department, does that matter with regard to whether there is a legitimate penological interest? In other words, does there have to be a factual basis or could the belief that he was doing this be a sufficient legitimate penological reason? Well, I think in order to draw the conclusion that this was, in fact, the reason, yes, we need a sufficient factual basis, otherwise we wouldn't have any reason. Well, I mean, the purported reason was a lot of people were coming in to have him typed. If they did no further investigation, is it a legitimate penological interest to transfer him because they thought, suspected, were concerned that he might be doing this? If that were true, I would concede that, yes, it's a legitimate penological interest. But on these facts, I would point out that there's no record of misconduct. And indeed, the only record that we have of plaintiff's performance at the library is a favorable and satisfactory performance review. So on these facts, I don't think that's true. So your theory isn't that the reasons in the declarations that we can glean, two or three different reasons that they're not legitimate penological, but because different reasons were given, that is another chit in your arsenal of circumstantial evidence to doubt that any of those reasons was the real one? Correct. And it creates a question of fact, which is all we need at this point. All right. You're over your time. But I want to thank you for participating in the pro bono program. The argument was very helpful from both of you. Thank you. We're going to stand in recess for five minutes. Thank you. All rise.
judges: Berzon, Christen, Nguyen